The next case this morning is 21-4067, Paugh v. Uintah County. Counsel for appellant, if you'd make your appearance and proceed, please. Thank you, Your Honor. My name is Frank Myler. My associate, Andrew Hopkins, is at the council table with me, and I represent all of the Uintah County defendants. Good morning, judges. This is a classic case where the lower court ignored some of the U.S. Supreme Court's instructions on one, trying to define clearly established at too broad of a level. Instead of looking at the particular acts of each separate defendant and seeing whether they were on notice beyond a doubt that they were violating clearly established law back in 2015. Now, we cited the Strain case, which this court ruled on last year. It's very important to look at that for several reasons. One is, in that particular case, they observed severe vomiting, severe tremors, and acute panic attacks. Nothing like that happened in this case. I submit to you that this was a run-of-the-mill withdrawal, but in that case, in the Strain case, which it seems quite significant when they had delirium tremens in that case, that they said that they believed that that was a lower level of withdrawal, because most withdrawals are lower level. Didn't Mr. Fuller offer testimony to the effect that this is the first time he'd ever had somebody come in from an emergency room with a prescription like that, as it was in this case? Going to your point that this was a run-of-the-mill alcohol situation, isn't that what he said? He did say that. Well, that doesn't make it run-of-the-mill, does it, if it's the first time in his experience he's had that happen? He's the only one that said that, too. That's correct. But then he went and got the prescription. He went and gave it to him. He did not notice anything strange. He did not notice- All right. Let me stop that for a second, please. Yes. On the point of him giving the prescription- Yes. There appears to be a dispute of facts over whether the decedent ever got the prescription. And under summary judgment principles in the context of qualified immunity, why doesn't the plaintiff get the benefit of that dispute? I mean, the court talked a lot about disputes, which I thought was sort of unfortunate, because the bottom line is, if there's a dispute in the qualified immunity context, doesn't the plaintiff get the benefit of that? Well, it does, if that were the only issue. But in this case, you can't speculate, and that's what's inappropriate, to speculate. The autopsy report said that they did not find the lithium, actually, librium, actually in his system. That's the point I'm making. So, I mean, there was actual hard evidence. Of that. It's not like, oh, that he didn't have any librium, and I thought there was testimony to the fact that ordinarily you would have librium, in terms of its half-life or whatever the principle would be used for dissipating in the body. Isn't that right? But there wasn't any dispute that he went to the pharmacy and that he gave him a prescription that we got from the pharmacy. That is not disputed whatsoever. Okay. That he went to the pharmacy. Yes. That's not disputed. No. That he actually got the drug, that he ingested the librium, that he got the librium. Why isn't that a disputed fact, given the evidence that there was no evidence of librium in his body? There was no evidence at all that the wrong prescription was given to him. There was no evidence of that whatsoever. What was the evidence that's undisputed is that he went to the pharmacy and gave him that prescription. That's not disputed. Even the judge acknowledges that, and she acknowledges also that Bunnell also gave him that prescription as well. Now, if that prescription was flawed by the pharmacy, that's certainly not my client's. No, no, no, no. Nobody's saying that, I don't think. But you're not addressing Judge Holmes's point, which is there isn't any of this medication found in his system. That matters at summary judgment. Well, it doesn't. It doesn't because, again, we can't speculate. What is undisputed is that he went to the pharmacy and that nobody believed that he didn't go to the pharmacy. He's the only one. It's just Fuller that went to the pharmacy, and it's just Fuller that allegedly gave that first prescription. Well, see, that's the point. And I don't want to take all your time on this one matter, but this actually is a theme throughout. But on this, I don't dispute that Fuller went to the pharmacy. And that's not a disputed fact. The broader point I'm trying to make is if the plaintiff has evidence that calls into question whether the deceased ever got the Librium, okay, under summary judgment principles, doesn't that mean that they get the benefit of the fact that he didn't get the Librium? That is not, okay, yes, but that is not dispositive of the issue, factual issue before us. All right, then, let's segue into why it isn't dispositive. But before you do that, I want to get back to what you said about Mr. Bonnell and Mr. Fuller. So you said that he was aware of it at Mr. Bonnell, but for purposes of summary judgment, isn't it a little bit even beyond what you've been talking about with my colleagues? Because on interlocutory review, aren't we required to credit the District Judge Parrish's assessment of what a reasonable juror, a reasonable fact finder could find? And she found in her thorough opinion that every one of these five defendants were aware of Dr. Bradley's follow-up instructions that he was to return to a private position upon worsening of conditions. And you mentioned Mr. Bonnell. Well, on page 63, Judge Parrish specifically found that a reasonable fact finder could find that Bonnell knew Paul was seriously ill and needed urgent medical treatment and disregarded this obvious substantial risk to Paul's health. And then elsewhere on the same page, found as a factual matter that Bonnell understood that his worsening condition meant he was supposed to go to the hospital. So if we credit what Judge Parrish found on page 63, unless it was blatantly contradicted by the record, aren't we required to determine whether it would have been a violation of clearly established law for Mr. Bonnell to have known that Mr. Paul was required to go to see a private physician if his conditions worsened and that he did know, Mr. Bonnell, know that his conditions had worsened? And if so, how can we possibly find that in 2015 our precedent wasn't voluminously clear that you cannot do that? There's a diagnosed condition. All of the defendants were aware of it. And this witness, Mr. Bonnell, specifically knew that his conditions had deteriorated. How can you win on that? Thank you, Your Honor. I think that it's a conclusion to say whether he knew that there was a worsening condition. What the Court should have done is look at the actual actions he did and what the issues that were confronting him at the time, the particular acts and what was confronting him. And actually, the medical record is helpful, actually, to the defendants because it just says return on worsening condition, but then in this it says what are mild conditions of withdrawal. It says that he has withdrawal. No question he came in with alcohol withdrawal. That's what it says. But in this document that they rely on, it says mild withdrawals are shaking or upset stomach and some things like that, but not the severe, which is like delirium tremens and the things actually that were found in the strain case to not be. So if we just looked at that, you can't just look at what worsening conditions is a vague term, but you look at this document and it defines when you contact the doctor and when you don't. When you keep referring to strain, you might be right, but were you intending to refer to Quintana? No, I also referred to Quintana as well. Strain versus, I'm going to mispronounce it, regalado. Okay. I just wanted to make sure. No, Quintana is very, very important also, and we do rely on it because the Judge Parrish says that he vomited. You know, first of all, Bunnell didn't see him vomit. There's no evidence that he ever saw him vomit. Most people did not see him. Some people didn't see him vomit. There was some dry heavings by Gower found out throughout the day. That was just afternoon because he slept until 11 when he was booked. But Quintana says that frequent vomiting alone is not enough. It says, I'm reading from the to present an obvious risk of severe and dangerous withdrawal. And so what Judge Parrish is doing impermissibly is saying, well, he had the chills only at night. At 10 o'clock when he's in the cement cell, he had the chills and they gave him a blanket. He had some shaking. That says it's mild in the doctor's report. Well, Dr. Bradley also said fever is one of the indications that his conditions had worsened. There's no evidence. I'm not a doctor, but I thought if you get chills, that's one of the markers of fever. If you're sleeping in a jail cell that's cement at night, you usually are cold. He didn't have a blanket. They gave him a blanket so he could sleep in the cell all by himself so he would actually get some rest. That is actually caring for him. It's not ignoring him. And yes, did they do everything perfectly? No, they did not. In hindsight, they did not. But they did not, he was talking with them. It wasn't, in both Quintana, these vomiting blood, that presence of blood is significant. And you know what? It's significant also in this Ashley Regional Medical Center. If they're vomiting blood, you need to call the doctor. If you have delirium tremens, you should call the doctor. In strain, he had acute panic attacks. He was shaking and had all these things. All he had was some vomiting, none apparently at night. So that's not worsening condition. He had shaking, yes, he had some shaking throughout the day and in the evening. We're not denying that. But that's mild. That says mild under the report. And what matters is what – Mild under Dr. Bradley's report? Yes, under the hospital's. This is what they're going on to say worsening conditions. It says, it defines withdrawal that's mild and withdrawal where you seek immediate medical care. It's all in that report that was relied upon by the district court judge. And so that report can't just be read in isolation when you have a vague term like worsening condition. What you have here, if you compare what my clients did – And I want to be clear. You are talking about the discharge that Dr. Bradley gave and his direction to bring him back if he had worsening conditions. You're saying that that document described these conditions as being mild. Yes, it does. Okay, yeah. And so, Your Honor, I think what's important here is not looking at the conclusion. I do want to save three minutes for rebuttal, but I just want to finish the sentence. What's important is not looking at the conclusions based upon the facts that Judge Parrish did, which isn't permissible to say whether they knew whether this was a serious medical condition, but to look at the factors for qualified immunity purposes. Let me stop you there, because in the qualified immunity context, one could say that what Judge Parrish did and what is, as far as I know, permissible, is to make the inference a judgment as to what a reasonable jury could infer from these historical facts. That's what a judge is supposed to be doing on qualified immunity in the district court. And so when Judge Parrish says, I look at these historical facts and I think a reasonable jury could infer X, you may call that a conclusion, but that's exactly what she's supposed to be doing. Well, except for that qualified immunity doesn't look at whether there's actually, the second prong of it, doesn't look at whether there's actually a constitutional violation, which gets to Judge Bacharach's comment there. It actually also gets to, objectively, whether the facts they were presented with, whether those violated clearly established law. And they don't, based upon strain and Quintana, both. They don't. So I would like to reserve my time. Thank you. May it please the court. My name is Christopher Peter Sorensen and I represent the state of Coey Paw in this case. So you've heard defendants, or in this case, appellants' arguments here today. I think it's evident that the choice before you is clear. Whether the Tenth Circuit is going to be a court that requires a scavenger hunt to find a case with precisely the same facts, or whether we follow established Supreme Court and Tenth Circuit precedent to determine that qualified immunity decisions can be clearly established by the weight of authority of this court, or by the contours of the right being clearly established by authority of other courts. I think the facts are, I know you've read them and I can tell, but I think some of the facts are very important in this case, as they were with Judge Parrish's opinion. When Coey Paw turned himself in, he was a chronic alcoholic. He was taken directly to the hospital, where his blood alcohol level was .324. A lethal dose for many people, indicating that he had very serious alcoholism, and it was a very serious condition. In fact, the medical record itself indicates that he'd been treated for this for some time, and previous stints with the Uinta County Jails had indicated that he'd had a history with them. And I don't mean to cut you off from your factual recitation, but I want to make sure I get to you're engaging with the view of opposing counsel regarding the contours of that report, and how one should evaluate worsening condition. What I gather from them is, even if you read Dr. Bradley's discharge report, you would not have thought that his condition had worsened. As Judge Holmes, you correctly pointed out, I don't believe that this was a regular occurrence for this jail. He was discharged with clear notes that say that if his condition worsened, I think a reasonably objective person could look at the word worsen and determine what that means. That means a deterioration. Were there parameters, and maybe I just don't recall this, but were there parameters in that report to say, look for these things to be worsening? It was not as clear as counsel has pointed out, Your Honors. It was just a rubric for general ideas of what a worse or a serious condition might be. Well, did he meet any of those? He did, Your Honor. And unfortunately, because of the lack of monitoring and some of the lack of screening that he received at the jail, we don't know if he even met more of those and if he even met the criteria for a serious condition. Give me a few that he met. Well, we know that throughout the day he was coughing, he was vomiting. He had to stop in the middle of his intake to run and to vomit and come back. And that was sometime after he was initially brought into jail. We know that he had nausea symptoms throughout the day and that he had fever-like symptoms. And he himself told them, I'm not peaked yet, meaning I am going to be withdrawing. I am withdrawing and when it happens, it's going to be bad. But within the context of Dr. Bradley's report, would that be an indication that his condition had worsened? Absolutely, Your Honor. Absolutely. As you go through that line of possible symptoms, again, not everyone is going to present with the exact same symptoms with withdrawal, but it's just a rubric, a guideline for these officers to look over and to see whether or not the condition is worsening. Let me ask this question on Mr. Fuller in particular. At least I understood that it was undisputed that he did not see Dr. Bradley's report. I mean, there's no contention that he actually saw that report, is there? You know, Your Honor, I don't believe that he actually saw the physical report, but he does have notes. And when you're talking about a small jail pod within, smaller than this room itself, and you're talking about three officers, you're not talking about a big jail. Yes, but that gets into speculation. Unless you have somebody saying that they told him. So would you think it is fair to take the premise, there may be another basis for his liability, which I want to talk about in a second, but do you think it's fair to take the premise that the jumping off point for him can't be that he read the report and knew its instructions about worsening conditions and didn't act on it? I think that might be a fair point for that specifically, but remember he was the officer that left the jail to go get the prescription. No, I'm going to get to other stuff on him that I want to explore, and specifically what I want to think about there is what really would be the basis for liability on him. It seems to me that there was some discussion in the opinion about things that he did not communicate to Dr. T.A. Clark when he talked to him. And that strikes me as being negligence. I mean, the reality is that Mr. Fuller is not a trained medical professional. I mean, he interacts with him. He goes and gets his Librium. He brings it back. But the fact that he didn't tell him that his blood alcohol level was that high, that kind of stuff, yes, he maybe should have done it, but that seems like negligence to me. I think as far as specifically Fuller is concerned, with every one of these officers, I think you can speculate the other way that they did or did not know. I think, as Judge Parrish found, that a reasonable jury in this situation could have found, based on the facts, that he did know that it was a very serious condition. And so it was more than a negligence situation. No, I'm not going to get into that. But on the specific issue of whether his failure to communicate certain things to Mr. Clark, I'm looking at the zone of his telephone conversation with Clark. His failure to tell him things like blood alcohol level, is that indicia of deliberate indifference? I think that there were other obvious symptoms that he was exhibiting that he deliberately ignored in providing to P.A. Clark. Well, let me ask this. Do you accept that for deliberate indifference purposes, there could be a distinction between what Mr. Fuller told P.A. Clark, as in telling him about the blood alcohol level, and I understood from the district court's opinion, there are certain things that Mr. Fuller, for purposes of summary judgment, mischaracterized. In other words, when he knew about certain symptoms that Mr. Paul had, and he told him he's okay, he's fine. Do you accept there's a distinction between those two? In other words, not telling him certain things, and actually affirmatively misrepresenting for purposes of deliberate indifference. I do believe, yes, there's a difference essentially between, and if I get your question correct, sort of acts or omissions. Yes. And I do believe there is somewhat of a distinction there. But I think you have to then look at the body of what was going on to be able to infer if a reasonable jury could decide, as Judge Parrish said, that Kobe Paul was in a worsening condition, so that Fuller didn't necessarily need to have eyewitness accounting of every single symptom that Kobe Paul was experiencing to be able to be deliberately indifferent. Well, he had instructions from P.A. Clark that he was supposed to respond if his condition got worse. He did. He did, Your Honor, yes. And so I think that conversation in and of itself should indicate to a reasonable officer that this is a serious condition that should be monitored, should be watched. And as I've mentioned already but is unfortunate, we have alleged in our briefing that Uintah County had a very serious lack in its training in supervising withdrawal symptoms of alcoholics, and especially with the way that they would then periodically be checking them and screening them, so that all these officers would have been put on notice about Mr. Paul's condition but unfortunately just don't have that information. Let's talk about the clearly established law point, which you alluded to, I think, early on. Do we have to have here an alcohol withdrawal case in order for there to be clearly established law that would fit this case? No, Your Honor. I think that the clearly established law in the Tenth Circuit simply refers to a serious medical condition. And certainly, as Your Honors have said earlier, that it's been well-established for well over, I guess, even since 2005. It's been clearly established in... If you had to pick one of our cases, which one would it be? I mean, probably the most recent Ceballos case that says, general statements of law are not inherently incapable of giving fair and clear warning in and in other instances of general constitutional rule already identified in the decision of law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful. Okay, and let me back up there. There's a distinction between this line of authority that flows from, I think, the Supreme Court case, Hope v. Pelcher, which says there can be egregious conduct. You don't need a factually opposite situation, and that will be clearly established law. Fairly high level of generality. There are other cases where you could say, I don't need to have alcohol, but I have a guy who had a severe heart condition, and at least the facts come close, you know, arguably. Okay, so what I'm saying is in this separate category, what contemporaneous around the same time case would be sort of your guiding star? Would it be Motto? Would it be what? Motto's a good one. I think Sealock's also a really good one as well, Your Honors. All right. Isn't the problem, one of the problems that you have on the position, you know, you mentioned earlier about that it's not a matter of going and trying to find a case with exactly the same circumstance. But didn't the majority in Quintana do pretty much that in terms of the context of heroin withdrawal, saying that there really aren't any tense hurricane cases, there are very few out-of-circuit cases that involve heroin withdrawal. In fact, only maybe one or two. And not because, not in terms of the objectives of Prompt 1 of the Eighth Amendment claim, but on Prompt 2 in terms of, you know, what are the symptoms that would create a red flag? And they specifically talked about vomiting and saying that, okay, well, if you vomit with blood, that's a marker, but if you just vomit all the time, that's not necessarily a red flag if you're experiencing heroin withdrawal. And you have all of these individuals that experience, you know, him vomiting sometimes but not necessarily continuing, a lot of times because they were only working a single shift. And isn't it a little bit like Quintana in terms of Prompt 2, the deliberate indifference problem? I think that there are definitely some similarities in Quintana in our case, Your Honor. However, I think there's also some very real distinctions between Quintana and our case. As far as the record shows in Quintana, he wasn't sent to the jail with specific instructions. He wasn't prescribed medication. And, yeah, while Quintana does talk a lot about bloody vomit, we have to also remember that alcohol withdrawal and opiate withdrawal have been treated differently because they have different outcomes. Opiate withdrawal has been ruled by many courts, including the 11th Circuit, as being uncomfortable for the person experiencing it, but it's not going to necessarily kill you, whereas alcohol withdrawal in the 7th and the 11th Circuit for quite some time has been established as a clearly serious condition that can kill you. So while Quintana might have similarities factually, I think that it's easily distinguishable from our set of facts just for a couple of reasons. But Quintana also is a very helpful case, I think, for our case as well, because it clearly lays out kind of the objective inquiry and the subjective inquiry that one must meet in order to show deliberate indifference. And I think as we read through that case, especially in where it says, well, it quotes Seelock and another several of the cases that we cite in our briefs, but it lays out clearly that given the facts that we've laid out, we meet that case both objectively, or that standard, excuse me, objectively and subjectively in spades. Are all the individual defendants using sort of the legal rubric of our cases in this area, are all of the defendants essentially gatekeepers? Yes, Your Honor, and that is another element of the claims that we've brought forward, is that one of the things that these officers did is act almost purposefully as gatekeepers to deny Mr. Paugh access to medical treatment. Because the bottom line is they wouldn't have been medical providers. The question is whether they would have taken him to get help. Absolutely. Well, it may be not just quite as clear as that because of the sort of unique position that Uintah County put its officers in, where it didn't have a medical staff on site at that point. The nurse was out on maternity leave. And so it kind of charged all of its officers with this quasi-medical status. But none of them had training. No, they didn't. So it's not like they would have been able to be the first-level provider of care, right? No, Your Honor. The question is whether they were deliberately indifferent in getting that person care. Absolutely, Your Honor, and we've alleged in our briefs, and I think it's well taken or well pled that they were gatekeepers and they were deliberately indifferent of that. Okay. Case is submitted. I'm sorry. Your argument is? No. Don't get nervous. We're fine. I'm talking about opposing counsel. Thank you, Your Honor. Sure. Thank you, Your Honor. None of them were gatekeepers. Mata and Seelock are talking about medical cases. And Rife v. Jefferson, this court's case from 2018, specifically addresses that issue and says that non-medical people are not gatekeepers. What do you mean non-medical people aren't gatekeepers? What are they if they aren't gatekeepers? They can't be medical providers. No. They're officers. They're corrections officers and they respond. But I think it's important because what it also says is that Mata and Seelock, and it addresses those, it's actually quite excellent because it addresses all the cases that are brought up by the district court, Rife v. Jefferson. Were there any gatekeepers in this case, then? Is there what? Were there any gatekeepers? You say they're not gatekeepers. The gatekeeper would have been the PA, Logan Clark, who was talked to about him being there and got the prescription and decided to change the prescription. And again, I agree, even according to Mata and Seelock, that is negligence if he didn't provide symptoms. They didn't provide symptoms of heart pain in, I think it was Seelock. That's very significant. Dr. Bradley had follow-up instructions that said, send him to a private physician, send him back to my hospital and ask for me if he froze up. So Volume 3 at 193, it actually says, contrary to what counsel just said, this says what it really says in that report about when you should contact the doctor, not what counsel just said. I asked the court to read that at 193, Volume 3. This is an objective standard, Your Honor. We do not look at the subjective assessments of findings of fact for purposes of qualified immunity on the second prong. Okay. I don't mean to be obstinate, but if you did answer my question, I'll accept it. Okay. But I don't know if you heard my question. I'm sorry. Were you intending to answer my question? Because I didn't correlate anything you just said with my question. I apologize. I must have misunderstood it. But if you intended to answer it, I accept that. Would you give me the question again? If Dr. Bradley had said, you prison people who are not gatekeepers are to send him back to my hospital and ask for me if he froze up, would you acknowledge that those people were at least gatekeepers subject to the Gate Amendment and deliberate indifference if they saw him throw up and they knew that they, based on what a medical doctor had specifically instructed, to send him back if he froze up? If he froze up? Yeah. No. I do not think that that. I think that if you read this report at 193, it actually says the opposite, that there needs to be blood in the vomit before you call. Okay. Just to make clear, my question is a hypothetical. Okay. Okay. So, okay. Okay. So I think that they're not a gatekeeper in that official way, and especially for purposes of qualified immunity, they're not a gatekeeper based upon right versus justice, because it says that if you're not a medical person, I think I see what you're saying. Is there a concept of gatekeeping? Yes. Yes. I think that they could be somebody that should respond. That would go with anybody, I suppose. Yes. Okay. That's all. I'm sorry. Okay. Thank you, Your Honor. Got it. Thank you for your arguments, counsel. The case is submitted. Thank you.